James Paul BURNS, Appellant,

v.

The STATE of Texas, Appellee.

No. 50576.

Court of Criminal Appeals of Texas.

May 3, 1977.

Rehearing Denied May 25, 1977.

Certiorari Denied Oct. 31, 1977.
See 98 S.Ct. 422.

Timothy Ann Sloan and Richard J. Clarkson, Odessa, for appellant.

John H. Green, Dist. Atty. and Dennis Cadra, Asst. Dist. Atty., Odessa, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

DAVIS, Commissioner.

Appeal is taken from a conviction for capital murder. Punishment was assessed at death.

The record reflects that on August 3, 1973, the appellant, Roy Owens, and Toby Burns picked up the deceased, G. W. McDonald, as he was leaving the Follis Drive-in in Odessa. They all drove the deceased to a caliche pit, robbed him, and beat him. They left the deceased at the caliche pit, severely injured, and naked except for his socks. They returned later, picked up the deceased, and put him on the hood of Owens' car. Owens held him and the appellant

hit him. The deceased fell to the ground, and Owens and appellant picked him up and placed him on the hood of the car again. Appellant got onto the hood of Owens' car and kicked the deceased twice in the head. Owens and the appellant pulled the deceased off the car by his legs and let him fall to the ground on his back.

Dr. Thomas Meek testified that McDonald died as the result of a brain injury which could have been caused by hitting, beating, and kicking the deceased about the head.

■ At the outset, appellant contends, "Article 1257, as amended in 1973, is unconstitutional for the reason that the caption or title to the 1973 Act, H.B. 200, appearing in Chapter 426, Acts, Regular Session of the 63rd Legislature, 1973, fails to meet the requirements of Article 3, Section 35, of the Constitution of Texas in that it 'embraces more than one subject' and is therefore insufficient to apprise the Legislature and the public of the full effect of the Amendment."

In *Smith v. State,* Tex.Cr.App., 540 S.W.2d 693, the exact same contention was raised and rejected by this Court.

Appellant contends, "The trial court erred in failing to remove capital punishment from the jury's consideration because at the time of the offense for which appellant was indicted no penal offense had been made a capital offense by law in violation of Articles 3 and 7, Texas Penal Code, 1925."

The instant offense was alleged to have occurred on August 4, 1973, and Art. 1257, V.A.P.C. as amended by Acts of the 63rd Legislature became effective June 14, 1973, and remained in effect until January 1, 1974, the effective date of the new Penal Code.

Appellant's contention is bottomed on the following arguments: (1) Article 1256, V.A.P.C. did not create a separate offense of "capital murder" as distinguished from other kinds of murder, (2) that Article 1257, V.A.P.C. merely established the punishments assessed for different kinds of mur-

der, (3) that Article 1256, supra, and Article 1257, supra, as amended in 1973 (providing for the penalty of life or death upon conviction for murder with malice aforethought under certain circumstances) are mutually exclusive, (4) that Article 3, V.A.P.C. declared that, "No person shall be punished for any act or omission, unless the same shall be made a penal offense, and a penalty is affixed thereto by the written laws of this state," (5) that because of Article 3, supra, it was necessary that there have been a separately declared offense of capital murder, and (6) that since there was no such separately declared offense of capital murder the appellant could not be validly convicted of capital murder.

Subsection (a) and the pertinent portion of (b) of Article 1257, supra, recite:

"(a) Except as provided in Subsection (b) of this Article, the punishment for murder shall be confinement in the penitentiary for life or for any term of years not less than two.

"(b) The punishment for murder with malice aforethought shall be death or imprisonment for life if: . . ."

Five circumstances are then enumerated under subsection (b) where the punishment can be life or death.

■ The language in subsections (a) and (b) negates appellant's argument that 1256, supra, and 1257, supra, are mutually exclusive. Just as 1257b, V.A.P.C. provided that murder without malice cannot carry a penalty longer than five years upon conviction, the Article under attack provides for the penalty range for murder with malice absent the circumstances set forth in subsection (b) of 1257, supra, and the penalty under the circumstances set forth therein. We reject appellant's contention that there had to be a separately declared offense of capital murder.

Appellant contends that the trial court erred in failing to remove capital punish-

ment from the jury's consideration because the allegation of robbery is fundamentally defective in that, "(A) The indictment does not allege robbery with the specificity required by the law of the State of Texas. (B) The portion of the indictment alleging robbery is duplicitous and multifarious and constitutes a conjunctive pleading in that it alleges murder 'while in the course of committing *and* attempting to commit' robbery."

The pertinent portions of Art. 1257, supra, provide:

"(b) The punishment for murder with malice aforethought shall be death or imprisonment for life if:

\*      \*      \*      \*      \*      \*

(2) the person intentionally committed the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, forcible rape, or arson."

■ It appears to be appellant's position that the indictment, in averring that the murder occurred "in the course of committing and attempting to commit the offense of robbery upon G. W. 'Pete' McDonald," failed to set forth the necessary elements of robbery. In *Livingston v. State,* 542 S.W.2d 655, a similar contention was rejected, this Court stating:

"In *Smith v. State,* 540 S.W.2d 693 (Tex. Cr.App.1976), we held that a capital murder indictment is not fatally defective because the elements of the robbery are not set out in the indictment charging murder during the commission or attempted commission of robbery. Under the new Penal Code, an indictment charging one offense during the commission of another crime need not allege the elements of the latter offense. [Citations omitted.]" [1]

■ With respect to appellant's complaint that the allegation of "[while] in the course of committing and attempting to commit . . . robbery" rendered the

---

1. While the omission of the elements of the offense did not render the indictment fatally defective, we note that the court properly in-

structed the jury on the law of robbery. See *Earl v. State,* Tex.Cr.App., 514 S.W.2d 273.

pleading duplicitous, this Court stated in *Jurek v. State,* Tex.Cr.App., 522 S.W.2d 934, "Further, the fact that each count of the indictment includes the presence of more than one of the aggravating conditions set forth in Article 1257(b)(2) does not render the indictment duplicitous . . . ."

■ Appellant contends that, "The trial court erred in that the jury selection process violated the guidelines of the Supreme Court of the United States in *Witherspoon v. Illinois,* 391 U.S. 510 [88 S.Ct. 1770, 20 L.Ed.2d 776] (1968)."

In *Hovila v. State,* Tex.Cr.App., 532 S.W.2d 293, we held that the holding of *Witherspoon*[2] was still alive and well in light of the new statutory scheme providing for the imposition of the death penalty, the adoption of which followed in the wake of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

The new statutory scheme for capital murder [V.T.C.A., Penal Code, Sec. 19.03 (formerly Art. 1257, Vernon's Ann.P.C., as amended in 1973) and Art. 37.071, Vernon's Ann.C.C.P.], including the possible infliction of the death penalty, has been upheld by this Court in *Jurek v. State,* supra, and by the United States Supreme Court in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929. See also *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913.

Appellant urges that prospective jurors Doss, Singleton, Tillman, Cagle, Mitchell, Burnette, Pitner, Davis and Mann were excused for cause in violation of *Witherspoon.*

Prospective jurors Doss, Singleton, Tillman, Cagle, Mitchell, Burnette, Pitner and Mann stated that the fact that the punishment was death or life imprisonment would affect their deliberations on "any issue of fact" or "on issues of fact" in the case.

Prospective juror Davis stated that her opposition to the death penalty would not affect her deliberations at the guilt stage of the trial. As to whether the mandatory punishment of life or death would affect her deliberations on any issue of fact at the punishment stage of the trial the prospective juror answered, "Yes, it would," "Very likely," and "I can't say that it will not affect my deliberations."

Appellant relies on *Grider v. State,* 468 S.W.2d 393 (Tex.Cr.App.1971) for the proposition that *Witherspoon* would not allow the State to challenge for cause a prospective juror who stated that his belief concerning the death penalty would affect his verdict on the punishment stage of the trial.

V.T.C.A. Penal Code, Sec. 12.31(b), enacted since *Grider,* provides:

"Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

In *Moore v. State,* Tex.Cr.App., 542 S.W.2d 664, this Court held that it was unnecessary to consider the *Witherspoon* question where a prospective juror had stated that her opposition to the death penalty

---

**2.** In *Witherspoon* the Supreme Court of the United States wrote:

"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected."

The Supreme Court further stated:

"Unless a venireman states unambiguously that he would automatically vote against the

imposition of capital punishment, no matter what the trial may reveal, it simply cannot be assumed that this is his position."

In *Boulden v. Holman,* 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969), the Supreme Court wrote:

"It is entirely possible that a person who does have a 'fixed opinion against' or who does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law—to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case."

would affect her deliberations on the fact issues submitted in the case. With respect to the narrower issue of whether a possible death penalty would affect a prospective juror's deliberations on any issue of fact at the punishment stage of the trial, this Court in *Whitmore v. State* (Tex.Cr.App. No. 52,325, Oct. 13, 1976) held that a prospective juror's answer that his opposition to the death penalty "would affect his deliberation on the fact issues submitted to him as required by Article 37.071" served to disqualify him under the provisions of Sec. 12.31(b), supra. In *Whitmore*, it was further stated, "It is of no consequence that prospective juror Rugg was qualified under *Witherspoon* [in light of disqualification under Sec. 12.31(b), supra]." We conclude that our recent decisions in *Moore* and *Whitmore* are adverse to appellant's contention that the jury selection process requires reversal of this cause.

Appellant contends that the trial court "erred in refusing to allow counsel for the defendant to examine prospective jurors prior to granting the State's challenge for cause because of the said jurors' opposition to the death penalty."

Appellant contends in his fifth ground of error that the trial court erred in denying him the opportunity to question three prospective jurors, prior to granting the State's challenge for cause. Specifically, appellant complains that he was denied the opportunity to examine veniremen Doss, Mitchell, and Pitner. As to such a denial of questioning by defense counsel, this Court held in *Huffman v. State,* Tex.Cr.App., 450 S.W.2d 858, as follows:

"Mrs. R. D. Lasater testified that she was conscientiously opposed to the imposition of death as a punishment for crime in all cases and could not impose such punishment for the offense of murder with malice aforethought. After the state had challenged Mrs. Lasater for cause, the appellant asked to take her on voir dire to further explore her feelings about the death penalty in the case. The court replied that in light of her answers to the court's questions the request would be

refused. The court should have granted the request to further examine Mrs. Lasater.

The voir dire examination of Lasater was made only by the trial court. No questions were addressed to her by counsel for the state or the appellant. Her testimony on voir dire was clear, positive, unequivocal, and without reservation. In light of the instructions given her by the trial court, the court's opportunity to observe her and to hear her answers, and the fact that the state exercised but 7 of its 15 challenges, the excusing of Lasater on the state's challenge would not constitute reversible error. . . ."

The record in the instant case reflects that Mrs. Doss, upon being questioned by the district attorney, stated unequivocally that she did not believe in the death penalty and that the mandatory penalty of death would affect her deliberations on issues of fact. The following then occurred:

"MR. GREEN: All right. Judge, we ask this juror be excused.

"MR. ABALOS: I think we should ask some further questions about this matter.

"THE COURT: I don't know what you could ask. You challenge her for cause, is that correct?

"MR. WILLIAMS: That's the magic term phrase and she answered it the way you are supposed to.

"THE COURT: Ma'am, I will excuse you. You are challenged for cause, you will not be on the jury. You are dismissed from jury service. Thank you very much for your attendance."

Mrs. Mitchell related that regardless of the facts of the case, she could not assess the death penalty and that such a punishment would affect her deliberations on issues of fact. After the State asked that she be excused, the record reflects the following:

"MR. CLARKSON: Your Honor, we would like to take her on a short cross-voir dire on this particular question. We are not sure if the witness has stated that it will affect her in the sense she considers the gravity of the death penalty or

does she mean that she couldn't consider death at all. We would like to ask some question on that.

"THE COURT: I think I understand her answer sufficiently to make a ruling. I will sustain the State's challenge for cause.

"MR. CLARKSON: Note our exception to that."

After Mr. Pitner stated he couldn't vote for the death penalty in any circumstances, the following occurred:

"MR. GREEN: Your Honor, we ask this juror be excused for cause.

"THE COURT: I will excuse you, sir. You will be excused.

"MR. CLARKSON: Your Honor, we want to take him on voir dire, we don't think he has met the *Witherspoon* requirement.

"THE COURT: I think you just stated that under no circumstances would he give the death penalty. Sir, is there any set, can you think of any crime, that you would give the death penalty? We are not asking you about this case, whatever you know about this case. I'm talking about any situation, can you conceive of any situation in which you would give the death penalty?

"A. Yes, I would. In a situation different from this."

Mr. Pitner was asked several more questions by the State, and he responded as follows:

"Q. All right. So I need to know?

"A. All right. I will say then that I wholeheartedly don't believe in the death penalty.

"Q. That is what you said, and I appreciate that answer, sir. And please don't let anybody change your mind by wishy-washy, in other words you told me, I think that is your belief, and I think you are entitled to that belief and you told me because I asked you before and I sincerely appreciate that answer because I think that is what you honestly believe?

"A. It is.

"Q. And you couldn't give it under any circumstances because I can tell by what you are saying. Is that true?

"A. That is true.

"Q. And I know it's what you believe and just tell the Court that is what you believe and stick by your belief, don't make us sit up here, you understand what I am saying, sir?

"A. That is what I believe.

"Q. All right. It would affect your deliberations?

"A. It would.

"Q. On any issue of fact in this case? I appreciate that answer and I respect you for that answer. Thank you. Your Honor, we ask he be excused for cause.

"THE COURT: Your answer, sir, so that I may understand it, is that because of your wholehearted disbelief I should say in the death penalty, such a disbelief would affect your deliberations of issues of fact in this case, knowing that a mandatory penalty of death or life imprisonment is a possibility in a case of this nature, that your disbelief in the penalty of death would affect your deliberations on issues of fact in this case, is that correct?

"A. Yes, it still would, Your Honor.

"THE COURT: All right.

"MR. GREEN: Thank you, sir. I appreciate it. Your Honor, we ask ___ thank you, Mr. Pitner.

"THE COURT: Make your proper motion. You challenge for cause?

"MR. GREEN: Yes, sir.

"THE COURT: Sir, you are excused, and we do thank you very much for you [sic] service. And you are excused for the entire term.

"A. Thank you.

"MR. CLARKSON: Your Honor, we except to the Court's ruling, our objection is based on the *Witherspoon* case.

"THE COURT: All right. . ."

■ We find that the court erred in not granting appellant's request to further examine Mrs. Doss and Mrs. Mitchell. *Huffman v. State,* supra. However, since both Mrs. Doss and Mrs. Mitchell stated unequivocally that they could not vote for a death sentence regardless of the circumstances and that it would affect their deliberations on issues of fact, because of the court's opportunity to observe them and to hear their answers, and because the State only exercised 13 of its 15 peremptory challenges, no reversible error is shown. See *Huffman v. State,* supra. Likewise, we note that no request was made to examine Mr. Pitner after he was examined the second time and excused, thus defense counsel was not denied the privilege to question Mr. Pitner. See *Huffman v. State,* supra. It is further observed that the only comment made by appellant's counsel when Mrs. Doss was excused was, "I think we should ask some further questions about this matter." No reversible error is shown.

■ Appellant contends that the court erred in excusing for cause prospective jurors Cagle and Tillman "on the court's own motion and without challenge."

Prospective juror Tillman stated that the mandatory penalty of death or imprisonment for life would affect his deliberations on any issue of fact. The court excused Tillman without a challenge having been made. Appellant objected for the failure of the prosecutor to ask the "question required by the *Witherspoon* case."

Prospective juror Cagle stated that he believed that the mandatory penalty of death or imprisonment for life would affect his deliberations "on any issue of fact in this case" and that he did not believe in the death penalty "under any circumstances." The court excused Cagle without a challenge having been made and appellant objected that the prospective juror had not been asked the questions "required of the *Witherspoon* case."

Appellant made no request to examine Tillman or Cagle. Tillman was disqualified under V.T.C.A. Penal Code, Sec. 12.31(b),

when he stated that the penalty of death or life imprisonment would affect his deliberations on any issues of fact. See *Moore v. State,* supra; *Woodkins v. State,* Tex.Cr. App., 542 S.W.2d 855. Cagle stated that he did not believe in the death penalty "under any circumstances" and he believed that the penalty of death or life imprisonment would affect his deliberations on any issue of fact. While his statement relative to his belief that the penalties would have an effect on his deliberations on any issue of fact may not be characterized as unequivocal, Cagle's answer relative to not believing in the death penalty "under any circumstances" was positive. We find the prospective juror's answers tantamount to a declaration that his qualms about the death penalty would prevent him from being an impartial juror in a case in which the range of punishment included the death penalty. See *White v. State,* Tex.Cr.App., 543 S.W.2d 104.

■ Further, appellant voiced no objection in the trial court on the basis now urged that the jurors were excused "on the court's own motion and without challenge." He cannot be heard to complain on appeal. See *Boulware v. State,* Tex.Cr.App., 542 S.W.2d 677.

■ Appellant contends that the trial court erred in refusing to grant him additional peremptory challenges.

Appellant complains that he was forced to accept jurors Bunger and Roberts against his wishes. At the conclusion of the voir dire examination of Bunger, counsel for appellant asked for one additional peremptory challenge and, after such request was refused, counsel stated, " . . . this Defendant accepts this witness under coercion, having used up his peremptory challenges."

After the conclusion of the voir dire examination of Roberts and the acceptance of Roberts by the State, the record reflects the following:

"THE COURT: Do you care to make a challenge of any kind?

"MR. CLARKSON [counsel for appellant]: We request another peremptory challenge, Your Honor.

"THE COURT: All right. I will deny your request for a peremptory challenge.

"MR. CLARKSON: Thank you, Your Honor. Note our exception."

The record reflects that Roberts was the twelfth juror selected.

Appellant did not attempt to challenge either juror for cause either before or after his request for an additional peremptory challenge. See *Tezeno v. State,* Tex.Cr. App., 484 S.W.2d 374. In *Stephenson v. State,* Tex.Cr.App., 494 S.W.2d 900, the defendant complained that he was forced to take an "objectionable" juror after he exhausted his peremptory challenges. This Court stated:

"An objectionable juror, in the sense in which the term is used in this connection, 'means one against whom such cause for challenge exists as would likely affect his competency or his impartiality in the trial.' *Hudson v. State,* 28 Tex.App. 323, 13 S.W. 388, 389. Without some such showing, it is idle simply to say that a juror is objectionable."

Appellant does not point to any place in the record, nor do we find anything in the voir dire of Bunger and Roberts, to suggest that either of them was an "objectionable" juror as that term is defined in *Stephenson v. State,* supra.

In his next two contentions, appellant contends (1) that Art. 1257(d), V.A.P.C. is unconstitutional because it violates the mandates of *Witherspoon v. Illinois,* supra, and (2) that the court erred in prohibiting counsel from telling the jury panel during voir dire examination the effect of the "yes" or "no" answers to the questions that would be asked the jurors at the punishment stage of the trial.

■ It appears to be appellant's position that 1257(d), supra, is unconstitutional insofar as it allows a prospective juror to be challenged for cause because his opposition to the death penalty might affect his answers to questions at the penalty stage of the trial.

In *Moore v. State,* supra, this Court found that prospective jurors "were properly excused under this State statutory provision without the necessity of consideration of whether their answers also disqualified them under [*Witherspoon*]." As heretofore noted, in *Whitmore v. State,* supra, this Court found it was of no consequence that a prospective juror was qualified under *Witherspoon* where he answered that his opposition to the death penalty would affect his deliberations on the fact issues submitted to him as required by Article 37.071. In light of *Moore* and *Whitmore,* it became unnecessary to determine whether the mandate of *Witherspoon* has been violated when a juror disqualifies under the statute by expressing the view that his opposition to the death penalty might affect his answers to questions at the penalty stage of the trial.

■ While the precise question raised by appellant's contention that the court erred in not allowing counsel to tell the prospective jurors the effect of "yes" and "no" answers (to the questions asked the jury at the punishment stage of the trial) was not before the United States Supreme Court in *Jurek v. Texas,* supra, it is noted that the opinion therein recognized that after affirmative answers were given by the jury to the questions asked at the punishment stage of the trial pursuant to Art. 37.071, V.A.C.C.P., " . . . the judge, therefore, in accordance with the statute, sentenced the petitioner to death." In *Jurek,* the Supreme Court found that our "new capital sentencing procedure" met constitutional muster.

In *Hovila v. State,* supra, while noting that the jury would know the effect of their answers to questions submitted under Art. 37.071, supra, it was stated: The "new statutes" require "them [the jury] only to answer questions while the judge assesses the punishment based on such answers."

Since it is the duty of the jury to answer the factual inquiries and the duty of the court to assess punishment based on these answers, we find no error in the court disal-

lowing counsel to tell the jury panel the effect of their "yes" and "no" answers.

■ In four grounds of error, appellant attacks the constitutionality of this State's system for imposing capital punishment. The new capital sentencing procedure was found to meet constitutional standards by the United States Supreme Court in *Jurek v. Texas,* supra. Without setting forth each of appellant's attacks, it will suffice to note that his contentions have been answered adversely to him in *Jurek; Gregg v. Georgia,* supra; *Proffitt v. Florida,* supra.

Appellant contends, "The trial court erred in entering sentence and judgment of death based on the jury verdict of 'yes' to issue (2) as set forth in Article 37.071(b) of the Texas Code of Criminal Procedure, as amended 1973, because the State failed as a matter of law to meet its burden of proof on this issue."

■ Article 37.071(b)(2) requires that the jury be asked "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

Appellant points to the fact that the only evidence introduced at the punishment stage of the trial consisted of the testimony of District Attorney Aubrey Edwards of the 83rd Judicial District, who testified that appellant pled guilty to burglary in Pecos County on September 14, 1973 and, based on his experience that " . . . once they have committed one offense they are a menace to society and continue to do so," he felt that appellant would "commit criminal acts of violence that would constitute a continued threat to society," and the testimony of a number of officers that appellant's reputation for being a peaceable and law-abiding citizen was bad.

In *Smith v. State,* supra, where defendant was convicted of a capital murder, the murder occurring during the course of a robbery, this Court, after reviewing the testimony adduced at the punishment stage of the trial as well as the facts surrounding the murder adduced at the guilt stage, concluded, "His [defendant's] entire conduct was calculated and remorseless, and the jury was justified in finding this appellant will always constitute a continuing threat to society."

The court, in the instant case, properly instructed the jury, "You may take into consideration all the evidence submitted before you under this charge and the previous charge, wherein you found the defendant guilty in arriving at your answers on the above issue."

A psychiatrist testified in *Smith* that the defendant felt no remorse for the murder and that in his opinion his conduct would not change in the future. There was no testimony from a psychiatrist in the instant case relative to appellant's future conduct. Nevertheless, we find the facts adduced at the guilt stage of the trial in the instant case to furnish greater probative evidence to support the jury's answer than an opinion which may be gleaned by a brief psychiatric examination.

Evidence presented at the guilt stage of the trial reflects that appellant, Toby Burns, and Owens took the deceased, a fifty-eight year old man, to a caliche pit west of Odessa. According to the story they related to Owens' roommate, Jerry Harper, later that same night, the deceased was robbed of his money, clothes, boots, watch and false teeth. The victim was beaten and left at the caliche pit. Harper testified that "Roy [Owens] was giggling and he told me, he said guess what Jamie [appellant] done and I said what, he said Jamie screwed the old man in the ass." Appellant and his companions had gotten Harper out of bed about 3:00 a. m. They told him that his mother had called earlier, "sounded like she was worried and wanted, sounded like I need to go to the house. . . ." Instead of taking Harper to see his mother, they drove to the caliche pit in question, where Harper observed the deceased lying on the ground "completely naked except his socks." The deceased "looked like he was almost dead—his face was black and blue and bloody and dried blood in places and his jawbone was broken, looked like it was broken all the way from back of his jaw to

his chin and stuck out about an inch and a half." Appellant and the two co-defendants "sat him [deceased] on the hood of Roy's car." Roy held the victim on the hood of the car while appellant hit him and then appellant "got up on the hood of the car and kicked him in the head twice." This was followed by appellant and Roy each grabbing a leg and "pulled him straight off [the hood] real fast and let him fall to the ground." They were "acting like it was fun." Harper stated that he tried to get them not to hit the man and threatened to leave if they did not stop. Becky Burns, wife of Toby Burns, testified that appellant and Roy Owens came to her house on the night in question and appellant told her about robbing and beating a man and showed her some of the money taken from the victim. According to Becky Burns, further details related to her that night were "That they had the man sitting on top of the car and made him smoke some pot. Jamie [appellant] kicked the man in the face and Roy made, and he messed on the top of the car and Roy made him eat it off." Appellant showed her boots he had taken off the victim and she later saw appellant wearing them. Becky Burns related that they thought it was funny and were laughing about "beating this man."

Evidence of an extraneous offense was admitted relative to appellant and the co-defendants, along with Harper, taking a man about the age of the deceased who was intoxicated to the same caliche pit a week earlier. On this occasion, all of the victim's clothes were removed except his shirt and the victim was beaten, robbed and his car torn up. As in the instant case, the victim was left in the caliche pit after the initial assault and appellant and his companions returned to further beat him. Becky Burns testified that on one occasion, appellant was in a group that told her that they made their living by "taking men out—taking their money, robbing them."

We find the evidence sufficient to support the jury's finding that appellant would commit criminal acts of violence that would constitute a continuing threat to society.

Appellant contends that "the court erred in allowing Becky Burns to testify as her husband was a co-indictee in this case."

It was undisputed that Becky Burns was the wife of co-defendant Toby Burns at the time of this trial and that an indictment was pending against her husband for the offense for which appellant was on trial. When the State called her as a witness, the appellant filed his motion asking that the court find her incompetent to testify in that she was the spouse of a co-defendant. The court ruled adversely to this motion and, as heretofore stated, Becky Burns gave damaging testimony against appellant.

Article 38.11, V.A.C.C.P. provides in pertinent part:

" . . . The husband and wife may, in all criminal actions, be witnesses for each other, but except as hereinafter provided, they shall in no case testify against each other in a criminal prosecution."

Appellant cites C. McCormick & R. Ray, Texas Evidence, Sec. 370 (2d ed. 1956), where the rule is stated:

"A spouse is not a competent witness against a co-defendant of the other spouse. And as long as a husband is under indictment, his wife cannot be used against his co-defendant. But any condition which renders the husband or wife immune from harm from the other's testimony makes such spouse a competent witness against the other's co-defendant."

This rule appears to have evolved from an 1898 case, *Dungan v. State,* 39 Tex.Cr.R. 115, 45 S.W. 19, cited by appellant, which stated:

" . . . where the husband is under indictment with the co-defendant, who is an alleged principal in the offense, and the case is still pending against the husband, and he has not been introduced as a witness by the state, the wife is not a competent witness."

In *Dungan, Bluman v. State,* 33 Tex.Cr.R. 43, 21 S.W. 1027 and 26 S.W. 75 (1893), was relied upon. In *Bluman,* it was found that, "If a co-defendant be on trial, the one not on trial may be made a witness by the

state; and then the witness' wife is a competent witness."

Still an earlier case, *Dill v. State,* 1 Tex. Cr.App. 278 (1876), quoted with approval from *Commonwealth v. Eastland,* 1 Mass. 15, which stated the common law rule to be: " 'To have had the benefit of her testimony *they should have moved to be tried separately from the husband,* which the court could have granted had this been assigned as a reason for the motion.' " [Emphasis supplied.]

Article 38.11, supra, is explicit in providing that a wife may not testify against her husband. Even where the impression is conveyed to the jury that a wife's testimony would be adverse to defendant's testimony by the State calling the defendant's wife as a witness requires reversal. *Johnigan v. State,* Tex.Cr.App., 482 S.W.2d 209.

The reason for not allowing the testimony of a co-defendant's wife in a trial where he is being tried with others is obvious. Even if she never mentions his name, any testimony she may give may result in harm to her husband in contravention of Art. 38.11, supra.

Can a husband be harmed by his wife's testimony in a separate trial of one of his co-defendants? When his case is later called to trial, the wife is prohibited from testifying against him under 38.11, supra. His wife's testimony at the co-defendant's trial will not be admissible against him in his trial, nor can it be used to impeach him or other witnesses besides her. *Ross v. State,* 103 Tex.Cr.R. 658, 282 S.W. 221. If the husband calls his wife to testify for him, she may be only cross-examined on that which is germane to her direct examination. McCormick & Ray, Texas Practice, Evidence, Sec. 500 (2d ed. 1956); *Splawn v. State,* 162 Tex.Cr.R. 197, 283 S.W.2d 66. *Dollinger v. State,* 156 Tex. Cr.R. 397, 242 S.W.2d 891; *Roberts v. State,* 74 Tex.Cr.R. 150, 168 S.W. 100. Thus, while the wife would not be allowed to perjure herself where she is called by her defendant husband as a witness, she would not be required to testify against him. We find

that the prohibition against spouses testifying against each other set forth in Art. 38.11, supra, does not prohibit a spouse from testifying against his or her spouse's co-defendant if the co-defendant is tried separately. All cases holding to the contrary are overruled.

Appellant contends that the court erred in admitting into evidence a plastic baggie of marihuana.

A baggie of marihuana found at the scene of the crime by an officer was introduced into evidence over the objection of the appellant.

Appellant urges that the baggie of marihuana "was not relevant or material to any element of the crime of murder (or of robbery) and further the evidence tended neither to prove nor disprove any fact material to the case and the marihuana was never linked to appellant."

The baggie of marihuana was found near the body of the deceased. Becky Burns testified that appellant and Roy Owens had told her on the night in question that they made the deceased smoke "pot." We find that the exhibit was admissible under the rule which provides that all of the facts and circumstances surrounding the commission of an offense are admissible. *Calverley v. State,* Tex.Cr. App., 511 S.W.2d 60; *Lassere v. State,* Tex. Cr.App., 458 S.W.2d 81.

Appellant contends that the court erred in admitting evidence of the extraneous offense concerning the beating of Barnett which occurred a week prior to the offense in question at the same caliche pit.

Appellant points to the testimony elicited by the State from Harper and Becky Burns relative to the Barnett beating. There can be no doubt but what this testimony was damaging to appellant.

After Harper had testified about appellant and the co-defendants getting him out of bed at 3:00 a. m. on the pretext that his mother wanted to see him and instead of taking him to see his mother they proceeded to the caliche pit where he witnessed the

beating of the deceased, he was taken on extensive cross-examination by appellant. Harper was cross-examined about whether he saw a torn-up car near the deceased. He answered that he had not and, in response to further questioning, stated that he had been to this location one week before. Appellant then questioned him about a torn-up car that was there on that occasion and had Harper describe in detail the damage to the car, including which windows were broken out. It was developed that counsel for appellant had taken an affidavit from Harper prior to trial and Harper was questioned about the statement in his affidavit about not knowing the identity of the deceased and that he had told appellant's counsel that he thought the victim was a person other than the deceased. When Harper was questioned further about this matter, he explained that when they arrived at the caliche pit, Roy picked the victim up and, "Roy said look who we got here. I said that is not the same guy you all had out here the other time. He said yes, it is, so I believed him. I thought it was the same guy." Upon still further cross-examination relative to Harper not knowing the identity of the victim, the witness stated:

"Well, at first I didn't know who it was, it didn't look like the same guy they had out there before.

\* \* \* \* \* \*

"After Roy told me it was Mr. Barnett then I believed it was Mr. Barnett."

Harper had testified on direct that the victim was naked except for his socks. In an apparent attempt to impeach the witness, counsel for appellant showed him the affidavit they had taken from him prior to trial and asked if he didn't state after having been sworn that the victim had a shirt on. Harper answered:

". . . You were talking about two different things. You all wanted to know what had happened, everything, even the Barnett deal that happened before the McDonald deal did . . . the statement that you have got then may be the statement I made on the Barnett case."

Cross-examination was again directed to the matter of whether there was a car at the scene when the witness saw the deceased and, at the conclusion of these inquiries, Harper was again questioned about having stated that the victim had a shirt on, to which he replied, "There was two men though, like I say."

In *Patterson v. State,* Tex.Cr.App., 509 S.W.2d 857, complaint was made of a question asked by the prosecutor on redirect examination and the answer given by the investigating officer, who replied, "Yes, sir, he did" to the question, "Did he then tell you that he had killed this woman?" Prior to this question and answer, the defendant had elicited from the officer on cross-examination that the defendant had stated, "He told her that he understood I was like his father. His father had been a policeman and that's all his father ever wanted was the truth." This Court held that the complained-of testimony was admissible and that the defendant, having inquired of the witness officer what defendant had told him, was in no position to complain under Art. 38.24, V.A.C.C.P. Art. 38.24 provides:

"When part of an act, declaration or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read, all letters on the same subject between the same parties may be given. When a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence."

Reversal resulted in *Roman v. State,* Tex. Cr.App., 503 S.W.2d 252, where the defendant on cross-examination elicited testimony from the officer that his informant had told him that J. C. might be in the apartment when he arrived. Thereafter, over defendant's objection, the officer was permitted to answer on redirect that the informant had told him that on another occasion he had been to defendant's apartment and had seen a large quantity of marihuana and had seen defendant and J. C. rolling, smoking

and packaging it. This Court concluded that the testimony offered on redirect was wholly unrelated to the matter inquired about on cross-examination by defendant and should not have been admitted. The purpose of 38.24, supra, was stated to be to reduce the possibility of the fact-finder receiving a false impression from hearing the evidence of only part of the conversation, act, or declaration.

In the instant case, the appellant cross-examined the witness about his observations at the scene a week prior to the murder. An effort was made to impeach the witness by use of the affidavit of the witness on matters stated therein which related to the Barnett beating and robbery which occurred a week earlier. The result of appellant's extensive cross-examination on those matters relating to the extraneous offense undoubtedly left the jury in confusion and possibly under a false impression as to seemingly inconsistent statements made by Harper. We find that as a result of the appellant's cross-examination, the State was entitled to inquire into "the whole on the same subject inquired into" and present evidence of the extraneous offense.

Appellant contends that the court erred in not instructing the jury to disregard evidence of extraneous offenses as evidence of his guilt.

Appellant requested the following instruction:

"You are further instructed as a part of the law in this case that certain evidence was admitted in evidence before you in regard to the Defendant's allegedly having been involved in an offense other than the one for which he is now on trial. You are instructed that such evidence cannot be considered by you against the Defendant as any evidence of guilt."

No objection was voiced to the complained-of omission in the charge and appellant relies on the court's refusal to grant his requested charge.

■ In *Walker v. State,* Tex.Cr.App., 440 S.W.2d 653, the defendant requested an instruction to disregard "any real or imagined violations of the law" on the part of the defendant "aside from the offense charged." This Court held that in light of the defendant's failure to distinctly specify and point out what extraneous offense to which he had reference, no error was shown in the court's failure to grant such instruction. In addition, we observe that the requested instruction did not specify for what limited purpose the evidence was admitted. No error is shown.

■ Appellant contends that the court "erred in failing to instruct the jury on the law of accomplices" at the guilt stage of the trial.

The record reflects that the appellant requested that an instruction be given the jury that Harper was an accomplice witness as a matter of law and in addition appellant asked for a charge where the factual issue of whether the witness is an accomplice is submitted to the jury. The court's denial of these requested charges forms the basis of appellant's contention.

The fact that Harper participated in the crime which occurred at the caliche pit a week earlier is of no consequence. *Washburn v. State,* 167 Tex.Cr.R. 125, 318 S.W.2d 627.

While Harper was apparently advised that appellant and the co-defendants had participated in a robbery, he was enticed to go with them on the pretext that they were taking him to his mother's. When he was offered money taken in the robbery, he refused. His uncontroverted testimony was that he tried to get appellant and the others to stop beating the deceased and that he in no way participated in the crime.

In *Singletary v. State,* Tex.Cr.App., 509 S.W.2d 572, an accomplice witness was described as a person who, either as a principal, accomplice, or accessory, was connected with the crime by an unlawful act or omission on his part, transpiring either before, at the time of, or after the commission of the offense, and whether or not he was present and participated in the crime. See Art. 38.14, V.A.C.C.P.

■ If there is a conflict in the evidence, then the court should charge the jury on the question of whether the witness was an accomplice as a matter of law. See *Colunga v. State,* Tex.Cr.App., 527 S.W.2d 285.

■ If there is not enough evidence to support a charge against the witness either as a principal, an accomplice, or an accessory, then he is not an accomplice witness. *Singletary v. State,* supra; *Silba v. State,* 161 Tex.Cr.R. 135, 275 S.W.2d 108 (1954).

We do not find that the witness Harper was an accomplice witness, nor do we find that the evidence raised the fact question as to his complicity.

No error is shown in the court refusing appellant's requested instructions to the jury.

Appellant contends that the court erred in failing to withdraw from the jury's consideration the following remarks of the district attorney made during jury arguments:

"(1) References to appellant as being an 'animal;'

(2) References to appellant as a 'killer;'

(3) Statement that district attorney could not be paid enough to convict an innocent man;

(4) The jury is the 'they' people—Why don't 'they' do something about this crime in the community.

(5) References to the Barnett beating."

■ Appellant first calls our attention to the argument of the district attorney, "You and each one of you pay me to do a job and I hope you pay me to see that animals like this Defendant doesn't walk the streets."

In *Marx v. State,* 141 Tex.Cr.R. 628, 150 S.W.2d 1014, cited by appellant, it was stated:

"We also think the calling of appellant 'a beast' was untimely and unwarranted. There seems to be naught shown in this record of bestial aspect."

Unlike *Marx,* the record in the instant case reflects a "bestial aspect." While the cases may be rare where the evidence justifies a prosecutor in referring to a defendant as an "animal," we find that the use of such term was warranted in the instant case and not an improper deduction from the evidence.

Likewise, the reference to appellant as a killer was a reasonable deduction from the evidence.

■ The prosecutor argued, "none of you—whatsoever pays me enough money to try to convict an innocent man based upon the evidence in this case."

Appellant's objection to the foregoing argument was overruled.

Prior to prosecutor's complained-of remarks, counsel for appellant argued to the jury with regard to the witness Harper, ". . . the State uses him to lie again. . . ." On another occasion, counsel for appellant argued, "The prosecutor will try to bring in these inflammatory type arguments to you, and the prosecutor will talk to you about law enforcement but will forget to mention the pure administration of justice. . . ." On still another occasion, counsel argued that the "prosecutor—says that he did not know that Jerry Harper was on probation. . . . You know that if this District Attorney is trying to send a man to the electric chair that he will know exactly what kind of witness he has got, what they are going to say and what their records are. Yet he tells you and wants you to believe that he did not know Jerry Harper was on probation. Don't you know that Jerry Harper was in his office many times discussing all this. The District Attorney does not go into a capital punishment case without having talked to his witnesses and looking at their background."

We find that the complained-of argument of the prosecutor was invited in light of counsel's argument that the State was using a witness to lie, was not interested in the administration of justice, and that the prosecutor was not telling the truth about his lack of knowledge of the record of a witness. See *Jones v. State,* Tex.Cr.App., 520 S.W.2d 755.

**286**

The "they" type argument where the prosecutor refers to the jury as the "they" people when the question is asked, "why don't they do something about this?" forms the basis of appellant's next complaint. In *Phillips v. State,* Tex.Cr.App., 511 S.W.2d 22, this Court found such an argument to be a permissible plea for law enforcement.

When the prosecutor argued that they (appellant and the co-defendants) took Barnett out to the caliche pit a week before, counsel for appellant objected and the same was overruled by the court. As heretofore noted, evidence was before the jury on the Barnett matter and we perceive no reversible error in the foregoing argument.

Appellant contends that the indictment did not sufficiently allege the offense of robbery (the elements of such offense not being set forth in the indictment) and therefore the court erred in charging the jury on a crime punishable under Art. 1257(b)(2), V.A.P.C. This contention has already been decided adversely to appellant in an earlier ground of error, where it was noted that this Court in *Smith v. State,* supra, and *Livingston v. State,* supra, held that a capital murder indictment is not fatally defective because the elements of the robbery are not set out in the indictment charging murder during the commission or attempted commission of the robbery. In its charge, the court properly instructed the jury on the offense of robbery. It was not prerequisite to the court including same in its charge that all of the elements of the offense of robbery be set forth in the indictment.

It appears to be appellant's further contention that since the indictment alleged, ". . . was then and there in the course of committing and attempting to commit the offense of Robbery . . ." and the charge to the jury recites solely "while in the course of committing the offense of robbery . . ." that there is a fatal variance between the charge to the jury and the indictment. It was permissible for the indictment to aver in the course of committing and attempting to commit

robbery, *Jurek v. State,* supra, and the fact that the charge recited that the indictment charged that the appellant committed the murder "in the course of committing the offense of robbery" does not result in a fatal variance between the indictment and the charge.

Appellant contends that the charge was defective in that the jury could not find appellant guilty of murder with malice aforethought unless they found appellant not guilty of robbery.

Appellant asserts two reasons upon which he bases this contention, "(1) the charge did not give appellant the benefit of any reasonable doubt as to the commission of the robbery, (2) the charge does not inform the jury that they may find appellant guilty of murder with malice aforethought even if the jury found that appellant had committed robbery."

The charge defines the offense charged (capital murder) and places the burden on the State to prove same beyond a reasonable doubt and further provides if the jury has a reasonable doubt that the jury must acquit the defendant. It appears to be appellant's position that two offenses, robbery and murder, are charged and the court must apply the law of reasonable doubt separately as to the two offenses of murder and robbery where the jury could find that appellant was guilty of murder and robbery without finding him guilty of capital murder. In *Woodkins v. State,* supra, this Court held that the trial court was not in error in a capital murder prosecution in failing to instruct the jury that they might find the defendant guilty of robbery. It follows that appellant was not entitled to separate charges on robbery and murder. No error is shown.

Finding no reversible error, the judgment is affirmed.

Opinion approved by the Court.

ROBERTS, Judge, dissenting.

For the reasons stated in Part I of my dissenting opinion in *Shippy v. State,* Tex.

Cr.App., 556 S.W.2d 246 (delivered April 27, 1977), I dissent to the majority's disposition of appellant's grounds of error relating to the trial court's violation of the mandate of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and in particular, appellant's complaint of the erroneous exclusion of prospective juror Tillman.

PHILLIPS, J., joins in this dissent.